137 F.3d 1094
 48 Fed. R. Evid. Serv. 1184, 98 Cal. Daily Op.
Serv. 1360,
98 Daily Journal D.A.R. 1903
UNITED STATES of America, Plaintiff-Appellee,
v.
Lamont Benedict NELSON, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Keith Lamar LOTT, aka Kevin Moore, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Kimberly Nichol EDWARDS, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
Bobby Lee SEHORN, aka Lamar Athens, Defendant-Appellant.
 Nos. 95-50455, 96-50417, 96-50396, 96-50412 and 96-50442.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Dec. 2, 1997.
Decided Feb. 26, 1998.
 
 Sherri W. Hobson, Assistant United States Attorney, San Diego, California, for plaintiff-appellee.
 Michael L. Crowley, San Diego, California, for defendant-appellant Lamont Benedict Nelson.
 Douglas C. Brown, San Diego, California, for defendant-appellant Keith Lamar Lott.
 Lee Anne Mattson, San Diego, California, for defendant-appellant Kimberly Nichol Edwards.
 Alex Landon, San Diego, California, for defendant-appellant Bobby Lee Sehorn.
 Appeal from the United States District Court for the Southern District of California; Irma E. Gonzalez, District Judge, Presiding. D.C. Nos. CR-95-00072-IEG, CR-95-0072-1-IEG, CR-95-0072-5-IEG, CR-95-0072-2-IEG.
 Before: BRUNETTI, HALL, and RYMER, Circuit Judges.
 CYNTHIA HOLCOMB HALL, Circuit Judge:
 
 
 1
 Appellants robbed two J. Jessop's Jewelry stores in San Diego on July 11 and August 12, 1992. The robberies were carefully planned operations. Members of the robbery crew posed as customers inside each store. Once these crew members were in position, another member of the crew entered and brandished a pistol. The rest of the crew then sprung into action, cleaning-out each store in a matter of minutes and escaping in stolen vehicles. Appellants managed to steal a considerable amount of jewelry and watches in this manner, most of which the stores obtained from out-of-state suppliers.
 
 
 2
 Stemming from the July 11 robbery, appellants Lott, Sehorn, Nelson, and Edwards were charged in federal court with aiding and abetting the interference with interstate commerce by robbery, in violation of 18 U.S.C. §§ 1951(a) and 2 [Count 1], and with aiding and abetting the use and carrying of a firearm during the commission of a crime of violence, in violation of 18 U.S.C. § 924(c) [Count 2]. Stemming from the August 12 robbery, appellants Lott, Nelson, and Edwards were charged with the same two crimes [Count 3 alleging the § 1951 violation and Count 4 alleging the § 924(c) violation]. Sehorn was not involved in the August 12 robbery.
 
 
 3
 After a jury trial, appellants Edwards and Lott were found guilty on all four counts. Appellant Sehorn was found guilty of counts one and two. Appellant Nelson was found guilty of counts three and four, and was acquitted of counts one and two.
 
 
 4
 Appellants appeal their convictions on numerous grounds. The district court had jurisdiction over the trial under 18 U.S.C. § 3231. This court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a). We affirm in part and reverse in part.
 
 
 5
 I. Did the jury panel represent a fair cross-section of the community?
 
 
 6
 Appellants argue that an under-representation of Hispanics by 3.9 percent in the 1995 jury wheel for the Southern District of California violated the "fair cross-section" requirement of the Sixth Amendment.[1] The district court found that a 3.9 percent absolute disparity between the proportion of Hispanics in the community and the proportion in the jury pool was legally insufficient to state a Sixth Amendment claim.
 
 
 7
 The Supreme Court has mandated a three-pronged test for establishing a prima facie violation of the Sixth Amendment's "fair cross-section" requirement: 1) that the group alleged to be excluded is a "distinctive" group in the community; 2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and 3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. See Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979).
 
 
 8
 It is undisputed that Hispanics are a "distinctive" group for purposes of Sixth Amendment analysis. Thus, appellants satisfied the first prong of the Duren test. However, the district court held that appellants did not satisfy the second prong.
 
 
 9
 This court has held that "[t]he second prong of the Duren test requires proof, typically statistical data, that the jury pool does not adequately represent the distinctive group in relation to the number of such persons in the community." United States v. Esquivel, 88 F.3d 722, 726 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 442, 136 L.Ed.2d 339 (1996). This court measures representation by the absolute disparity between the proportion of the group in the community population and the proportion represented on the master jury wheel. See United States v. Sanchez-Lopez, 879 F.2d 541, 547 (9th Cir.1989). Previous Ninth Circuit cases have held that absolute disparities even greater than the one present here did not violate the second prong of the Duren test. See Esquivel, 88 F.3d at 727 (holding that a 4.9 percent absolute disparity was insufficient to make out a Sixth Amendment violation); United States v. Suttiswad, 696 F.2d 645, 649 (9th Cir.1982) (holding that a 7.7 percent absolute disparity was insufficient to make out a Sixth Amendment violation). Thus, the absolute disparity in this case is insufficient to make out a prima facie claim under the Sixth Amendment.[2]II. Did the district court misinterpret or misapply the Hobbs Act?
 
 
 10
 Appellants were convicted for the robberies under the Hobbs Act. The Hobbs Act provides federal criminal penalties for "[w]hoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce" by robbery, extortion, or physical violence. 18 U.S.C. § 1951(a).
 
 
 11
 Appellants argue that after the Supreme Court's decision in United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Hobbs Act is only violated if the government shows a substantial effect on interstate commerce. However, this court has expressly held that the Lopez decision did not overturn the Ninth Circuit's rule that the government need only show a de minimis effect on interstate commerce for purposes of federal jurisdiction under the Hobbs Act. United States v. Atcheson, 94 F.3d 1237, 1241 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1096, 137 L.Ed.2d 229 (1997).[3] Moreover, a de minimis standard is consistent with the language of the Hobbs Act, which mandates penalties for whoever "in any way or degree" obstructs interstate commerce.
 
 
 12
 Applying the de minimis standard, we find that the government has met its evidentiary burden.[4] Each J. Jessop's Jewelry store was a commercial business actively engaged in interstate commerce at the time of the robberies. Trial testimony established that J. Jessop's stores conducted approximately 95 percent of their business with out-of-state firms. Over 90 percent of the merchandise sold by J. Jessop's was manufactured outside the state of California. J. Jessop's itself is owned by a company incorporated in Delaware, and its parent company is based in Toronto, Canada.[5] The robberies had at least a de minimis effect on interstate commerce.
 
 
 13
 III. Did the district court properly instruct the jury under 18 U.S.C. § 1951(a)?
 
 
 14
 Appellants claim that the district court erred in not adopting Sehorn's proposed jury instruction regarding guilt for aiding and abetting a crime under 18 U.S.C. § 1951(a). Sehorn proposed that the jury be instructed that the government must prove beyond a reasonable doubt that he "knowingly and intentionally aided and abetted the commission of the robbery ... and assisted in its commission in an active way, knowing that it had an impact on interstate commerce."The only element of Sehorn's proposed jury instruction that was not included in the actual jury instruction was the knowledge that the crime had an impact on interstate commerce. However, a defendant need not know that his or her crime will have an impact on interstate commerce in order to be found guilty under the Hobbs Act. See United States v. Jarrett, 705 F.2d 198, 204 (7th Cir.1983) (upholding jury instruction under the Hobbs Act that stated that defendants need not have known or intended their actions to affect interstate commerce); United States v. Boston, 718 F.2d 1511, 1516-17 (10th Cir.1983) (upholding jury instruction under the Hobbs Act that stated that a defendant need not have intended his actions to affect interstate commerce); cf. Atcheson, 94 F.3d at 1243 (holding that the government "need not show that the defendant's acts actually affected interstate commerce" but merely that there existed "a probable or potential impact") (citations omitted).
 
 
 15
 Thus, we hold that the aiding and abetting instruction was proper because defendants need not have known that their actions would actually affect interstate commerce.
 
 
 16
 IV. Sufficiency of the evidence under § 924(c)
 
 
 17
 Title 18 U.S.C. § 924(c) provides additional federal criminal penalties for using a firearm during "any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States." Appellants Sehorn and Edwards argue that there was insufficient evidence to convict them of aiding and abetting the use of a firearm in violation of § 924(c) during the July 11 robbery. Appellants Lott, Nelson, and Edwards make similar arguments regarding the August 12 robbery.
 
 
 18
 There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Iriarte-Ortega, 113 F.3d 1022, 1024 n. 2 (9th Cir.1997).
 
 
 19
 In Bailey v. United States, 516 U.S. 137, 147-49, 116 S.Ct. 501, 508, 133 L.Ed.2d 472 (1995), the Supreme Court held that "use" of a firearm under § 924(c) is limited to "active employment" such as brandishing or displaying the firearm. Appellants do not dispute that the gunman in each robbery actively employed the firearm under Bailey.
 
 
 20
 Appellants do argue that they did not aid or abet the use of the firearm. In United States v. Bancalari, 110 F.3d 1425, 1429-1430 (9th Cir.1997), this court held that in order to be guilty of aiding and abetting under § 924(c), "the defendant must have 'directly facilitated or encouraged the use' of the firearm and not simply be aware of its use." (citation omitted). In Bancalari, this court reversed a conviction where the district court's instructions allowed the jury to convict a defendant if he aided and abetted a kidnapping while merely knowing that a firearm was being used. Id. at 1429 n. 1. The court reasoned that a defendant may know that a gun is being used during the commission of the crime and not do or say anything to facilitate or encourage the use of that gun. Id. at 1430.
 
 
 21
 In the present case, the defendants did not simply rob the jewelry stores with knowledge that a gun was being carried or used during the robbery. Here, each defendant knew before the robberies that a gun would be used. This distinction is important because with foreknowledge, as opposed to mere knowledge at the scene, a defendant's actions before the crime may support a conviction for aiding and abetting. See United States v. Salazar, 66 F.3d 723, 729 (5th Cir.1995) (holding that an aider and abettor to a § 924(c) firearms crime need not have been physically present at the scene as long as he knew a gun was at least available to the principal and took some action which assisted the principal's use of the gun).
 
 
 22
 Of course, mere foreknowledge that a gun would be used remains insufficient. The prosecution must still prove a specific intent to aid the firearms crime, see Bancalari, 110 F.3d at 1430, and some act that facilitates or encourages that crime. However, if a defendant knew before the crime that a gun would be used and acted to facilitate or encourage that use, a jury may more easily be able to infer that the defendant specifically intended to aid the use of the firearm. See United States v. Castro, 887 F.2d 988, 995-96 (9th Cir.1989) (specific intent to aid and abet may be inferred from circumstantial evidence).
 
 
 23
 In this case, the acts that facilitated or encouraged the use of the firearm occurred during both the planning and the execution of the robberies. Sehorn and Nelson directed the planning of the first and second robberies respectively, and each specifically discussed and planned the use of the gun. Evidence of such planning directed at the gun itself is sufficient to support their convictions for aiding and abetting the use of the gun. See United States v. Easter, 66 F.3d 1018, 1023-24 (9th Cir.1995) (holding that sufficient evidence supported aiding and abetting under § 924(c) where the defendant participated in a discussion about the use of a gun before the robbery, knew who would carry the gun, and saw at least one of the guns).
 
 
 24
 The evidence also indicates that Edwards was present during the planning of the July 11 robbery and that Edwards and Lott participated in planning the August 12 robbery. However, a defendant's mere presence during the planning of the robbery and agreement to that plan in general does not show direct facilitation or encouragement of the firearm in particular. See Bancalari, 110 F.3d at 1430 (a defendant "cannot be convicted as an aider and abettor under § 924(c) merely because he knew that a firearm would be used or carried, and, with that knowledge, performed an act to facilitate or encourage the robbery itself") (quoting United States v. Medina, 32 F.3d 40, 45 (2nd Cir.1994)). There must be evidence that Edwards and Lott facilitated or encouraged the use of the firearm, and not merely the overall robbery.
 
 
 25
 There is evidence that Edwards directly facilitated or encouraged the use of the firearm during the July 11 robbery. The gun was brandished during this robbery in order to instruct the store personnel to get down or to stand up. One of the store personnel testified that Edwards participated in the delivery of those instructions.
 
 
 26
 There is also evidence that Lott directly facilitated or encouraged the use of the firearm during the August 12 robbery. The gunman during this robbery, Darry Herrington, was a witness during the trial. Herrington testified that while Lott was originally supposed to carry the gun, they changed the plan before the robbery. Herrington and Lott agreed that Herrington would carry the gun. During the robbery, just before Herrington entered the store and brandished the gun, Lott ordered the store employees not to move nor hit any buttons, thus allowing Herrington to enter safely.
 
 
 27
 However, there is no evidence that Edwards directly facilitated or encouraged the use of the firearm during the August 12 robbery. As noted above, while she participated in planning the robbery in general, she did not counsel or encourage the use of the gun in particular. While she participated in the robbery knowing a gun would be used, she took no action at the scene of the crime that encouraged or facilitated the use of the firearm.
 
 
 28
 Thus, we affirm all convictions except that of Edwards on Count 4. We find insufficient evidence to convict Edwards of aiding or abetting the use of the firearm in the August 12 robbery.
 
 
 29
 V. Did the district court properly instruct the jury under 18 U.S.C. § 924(c)?
 
 
 30
 Appellants argue that the district court improperly instructed the jury on aiding and abetting the firearms charge under 18 U.S.C. § 924(c). The district court instructed the jury that a defendant "may be found guilty of using or carrying a firearm" under an aiding and abetting theory. The district court further instructed the jury that the government must prove beyond a reasonable doubt that: (1) the offense of interfering with commerce by robbery and using and carrying a firearm was committed; (2) the defendant knowingly and intentionally aided, counseled, commanded, induced or procured another to commit the crime; and (3) the defendant acted before the crime was completed.
 
 
 31
 Appellants contend that these instructions "implied that the crime or offense aided or abetted was not the firearm charge but rather the robbery charge." This argument is without merit. The jury was specifically instructed that the offense at issue was using and carrying a firearm. Furthermore, the jury was specifically instructed that the defendant would have to knowingly and intentionally aid another in committing robbery and in using and carrying a firearm.[6] The jury instructions were proper.
 
 
 32
 VI. Were appellants selectively prosecuted?
 
 
 33
 Appellants argue that the prosecutor's decision to try the case in federal court, where the penalties for armed robbery are higher, constitutes selective prosecution. Nelson also claims that other Caucasians who were investigated for purchasing the jewelry stolen in this case were never prosecuted.
 
 
 34
 In order to make out a prima facie case of selective prosecution, appellants must show that: 1) others similarly situated were not prosecuted, and 2) the prosecution was based on an impermissible motive. See United States v. Bauer, 84 F.3d 1549, 1560 (9th Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 267, 136 L.Ed.2d 191 (1996).
 
 
 35
 The Supreme Court has held that "in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties." United States v. Armstrong, 517 U.S. 456, 464, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687 (1996) (quoting United States v. Chemical Foundation, Inc., 272 U.S. 1, 14-15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926)). Appellants have not overcome this presumption. A showing that a prosecutor was influenced by the penalties available upon conviction is insufficient, standing alone, to give rise to a selective prosecution claim. See United States v. Batchelder, 442 U.S. 114, 125, 99 S.Ct. 2198, 2204-05, 60 L.Ed.2d 755 (1979). In addition, the district court found that the Caucasians involved with Nelson were not prosecuted because the government lacked sufficient evidence for trial. Nelson offers no reason to overturn this finding. Thus, we hold that appellants' selective prosecution claims are without merit.
 
 
 36
 VII. Did the district court properly deny appellants' motion for a new trial based on alleged prosecutorial misconduct?
 
 
 37
 Appellants argue that they are entitled to a new trial due to prosecutorial misconduct. The alleged misconduct took place during the second round of redirect examination of a government witness, Janet Overstreet. The examination concluded as follows:
 
 
 38
 Prosecutor: In connection with the three felony convictions that have been discussed, did you cooperate in any way in connection with those felony convictions?
 
 
 39
 Overstreet: I was guilty.
 
 
 40
 Prosecutor: Just like you're guilty in connection with the San Diego robberies.
 
 
 41
 Overstreet: Exactly, exactly.
 
 
 42
 Prosecutor: Just like the defendants on trial are guilty.
 
 
 43
 Defense: Objection, your Honor, argumentative.
 
 
 44
 Defense counsel at that time moved for a mistrial, arguing that the prosecutor was improperly giving her personal opinion about the defendants' guilt. The district court denied the motion for a mistrial and later denied a motion for a new trial. Instead, the district court instructed the jury to disregard the prosecutor's inappropriate question. The district court also polled the individual jurors, each of whom stated that he or she thought the prosecutor's question was inappropriate, that he or she would disregard it, and that he or she did not hear any response.[7][7] The district court then gave another lengthy instruction to the jury.
 
 
 45
 The district court's denial of a motion for mistrial is reviewed for an abuse of discretion. See United States v. English, 92 F.3d 909, 912 (9th Cir.1996) (citation omitted). Under this standard, "the reviewing court cannot reverse unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (citation omitted). The district court's denial of a motion for a new trial based on prosecutorial misconduct is also reviewed for abuse of discretion. See United States v. Sayetsitty, 107 F.3d 1405, 1408 (9th Cir.1997) (citation omitted).
 
 
 46
 The government concedes that the prosecutor's final question to Overstreet was improper. The only issue is thus whether the jury was prejudiced by the question. See United States v. McChristian, 47 F.3d 1499, 1508 (9th Cir.1995) (noting that "prosecutorial misconduct invites reversal if it appears more probable than not that the alleged misconduct affected the jury's verdict") (citation and internal quotation omitted).
 
 
 47
 The district court did not abuse its discretion in concluding that the prosecutor's comment did not affect the jury's verdict. There was ample independent evidence upon which the jury could rely. Moreover, the district judge gave prompt cautionary instructions to the jury. "Ordinarily, cautionary instructions or other prompt and effective actions by the trial court are sufficient to cure the effects of improper comments." Id. at 1507-08 (citation and internal quotations omitted). This is because juries "are presumed to follow such cautionary instructions." Id. at 1508 (citation and internal quotations omitted). Appellants present nothing to rebut the presumption in this case.[8]
 
 
 48
 Thus, the district court did not abuse its discretion in denying appellants' motion for a mistrial and motion for a new trial.
 
 
 49
 VIII. Was Nelson's similar act evidence properly introduced?
 
 
 50
 Appellant Nelson argues that evidence of his involvement in a later robbery (in Tualatin, Oregon), and evidence of his attempt to sell stolen jewelry at an Oregon pawn shop, was improperly introduced. The district court ruled that this evidence was admissible under Fed.R.Evid. 404(b) on the issues of "preparation, plan, opportunity, and certainly knowledge." The evidence showed that Nelson planned and prepared the Tualatin robbery similarly to the San Diego robbery, including use of rental cars and guns, and attempted to sell the stolen jewelry after the robbery. The district court ruled that there were "sufficient material similarities" between the Oregon robbery and the San Diego robbery. The district court also ruled that the probative value of the other acts evidence was not substantially outweighed by the prejudicial impact.
 
 
 51
 The admission of evidence under Rule 404(b) is reviewed for abuse of discretion. United States v. Luna, 21 F.3d 874, 878 (9th Cir.1994).
 
 
 52
 In exercising its discretion to admit evidence of other acts under 404(b), the district court should be guided by four factors: (1) the other act(s) must be introduced to prove a material issue in the case; (2) in certain instances, the act(s) must be similar to the offense charged; (3) sufficient evidence must exist for the jury to find that the defendant committed the other act(s); and (4) the other act(s) must not be too remote in time. See United States v. Corona, 34 F.3d 876, 881 (9th Cir.1994). If the evidence meets this test, the court must then decide whether the probative value is substantially outweighed by the prejudicial impact under Rule 403.
 
 
 53
 As to the first prong, the evidence was relevant to Nelson's state of mind: his knowledge, intent, planning, and preparation in committing the act. Nelson's state of mind is relevant even though it was not the disputed issue in the case. See United States v. Mayans, 17 F.3d 1174, 1182 (9th Cir.1994) (holding that knowledge and intent were material issues simply because the government had to prove them, and this burden of proof was unaffected by the defendant's choice of defense).
 
 
 54
 As to the second prong, Nelson argues that the Tualatin robbery was not similar enough to the San Diego robbery to be admissible. However, Nelson himself recognizes that a much lower degree of similarity is required to prove a state of mind than to prove identity. See Luna, 21 F.3d at 878 n. 1. The Tualatin robbery was sufficiently similar to the charged robberies to show Nelson's knowledge, intent, planning, and preparation. Both robberies involved Nelson as the leader who told others what to do. Both robberies involved instructing the same individual to provide rental cars for the robbery crew. Both robberies involved guns. Both robberies involved attempts to sell the stolen jewelry after the robbery. Thus, the Tualatin robbery was sufficiently similar to the charged robberies to support the admission of the evidence for the limited purpose of showing Nelson's state of mind.
 
 
 55
 Because there is no serious dispute as to the third and fourth prongs of the test, the only remaining issue is whether the district court properly admitted the evidence under Fed.R.Evid. 403. Under Rule 403, evidence can be excluded if the prejudicial impact substantially outweighs its probative value. Here, the district court gave detailed limiting instructions in order to curtail any unfair prejudice that Nelson might suffer. This court can presume that the jury followed these instructions. See United States v. Enriquez-Estrada, 999 F.2d 1355, 1361 (9th Cir.1993). In fact, Nelson was acquitted of the July 11 robbery. Thus, the district court did not abuse its discretion in concluding that the evidence was admissible under Rule 403.
 
 
 56
 We hold that the district court properly admitted the evidence.[9]
 
 
 57
 IX. Did appellant Nelson suffer double jeopardy?
 
 
 58
 Appellant Nelson argues that his prosecution on charges related to the San Diego robberies violated his double jeopardy protection because he was previously convicted of a conspiracy to violate the Hobbs Act in Indianapolis, Indiana. Because of that previous conspiracy conviction, the district court in this case dismissed a conspiracy count against Nelson, finding that the San Diego conspiracy was part of the Indiana conspiracy. However, the district court refused to dismiss the aiding and abetting counts against Nelson.
 
 
 59
 Such refusal was proper. This court has expressly held that "conspiracy and aiding and abetting are separate offenses" and "one is not a lesser included offense of the other" for purposes of double jeopardy. United States v. Arbelaez, 812 F.2d 530, 534 (9th Cir.1987).[10] This court has specifically applied this principle to Hobbs Act violations. See United States v. Freeman, 6 F.3d 586, 601 (9th Cir.1993) (holding that a conspiracy to violate the Hobbs Act and a substantive violation of the Hobbs Act under an aiding and abetting theory were separate offenses for purposes of double jeopardy).
 
 
 60
 Thus, the district court did not err in refusing to dismiss the substantive Hobbs Act violations on double jeopardy grounds.
 
 
 61
 X. Did the district court properly deny Sehorn's motion for severance?
 
 
 62
 Appellant Sehorn claims that there was prejudicial spillover because the government presented testimony and evidence of the August 12, 1992, robbery in San Diego, in addition to the later Tualatin robbery, neither of which involved Sehorn. The district court denied Sehorn's severance motions.
 
 
 63
 A district court's denial of a motion for severance is reviewed for abuse of discretion. See Atcheson, 94 F.3d at 1244. "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." Id. (citation omitted). Furthermore, "[d]efendants must meet a heavy burden to show such an abuse, and the trial judge's decision will seldom be disturbed." United States v. Ponce, 51 F.3d 820, 831 (9th Cir.1995) (citation omitted).
 
 
 64
 The Supreme Court has held that the risk of prejudice posed by joint trials can be cured by proper jury instructions. See Zafiro v. United States, 506 U.S. 534, 540-41, 113 S.Ct. 933, 938-39, 122 L.Ed.2d 317 (1993). Moreover, "[a] defendant seeking severance based on the 'spillover' effect of evidence admitted against a co-defendant must also demonstrate the insufficiency of limiting instructions given by the judge." United States v. Joetzki, 952 F.2d 1090, 1094 (9th Cir.1991) (citation omitted).
 
 
 65
 Here, the district judge gave repeated instructions regarding the fact that Sehorn was charged in connection with the July 11 robbery only. The district judge twice instructed the jury that a separate crime was charged in each count and that the jury must decide each count separately. Sehorn fails to demonstrate how these jury instructions were inadequate. The jury was able to separate the two robberies with respect to Nelson, acquitting Nelson of the July 11 robbery. We see no reason why the jury could not also separate the robberies with respect to Sehorn.[11]
 
 
 66
 Thus, the district court did not abuse its discretion in denying Sehorn's motion to sever.
 
 
 67
 XI. Were Sehorn's speedy trial rights violated?
 
 
 68
 Appellant Sehorn argues that his speedy trial rights were violated. The Speedy Trial Act, 18 U.S.C. §§ 3161-3174, requires that a defendant's trial commence within 70 days from the later of the filing of an indictment or his first appearance, barring excludable time. United States v. George, 85 F.3d 1433, 1436 (9th Cir.1996). The district court rejected Sehorn's claim of a Speedy Trial Act violation, finding that there was no violation once excludable time was taken into account.
 
 
 69
 A district court's application of the Speedy Trial Act is reviewed de novo. Id. at 1436. The court's factual findings under the Speedy Trial Act are reviewed for clear error. United States v. Contreras, 63 F.3d 852, 855 (9th Cir.1995) (citation omitted). The court's finding of an "ends of justice" exception also will be reversed only if there is clear error. United States v. Paschall, 988 F.2d 972, 974 (9th Cir.1993) (citation omitted).
 
 
 70
 Appellant Sehorn recognizes that there are a number of exceptions to the Speedy Trial Act's 70-day requirement. Section 3161(h) excludes certain periods from the 70-day calculation, including delay from any pretrial motion, delay when the defendant is joined for trial with a codefendant, and delay resulting from a continuance granted by the judge upon a finding that the best interests of the public would be served. One of the factors that a judge may take into account for such a finding is the complexity of the case. See § 3161(h)(8)(B).
 
 
 71
 It is uncontroverted that all appellants filed numerous pretrial motions. Sehorn filed pretrial motions twelve days after his initial appearance. Lott's attorney also represented that all appellants seemed willing to waive their speedy trial rights because the case was complex. Later, while the pretrial motions were still pending, the district court made a specific finding that the case was complex and would thus be continued. All appellants except for Sehorn declared that they needed a continuance in order to be prepared for trial.
 
 
 72
 Sehorn argues on appeal that to the extent that the speedy trial period was tolled based on the motions of his codefendants, the Speedy Trial Act is unconstitutional. However, the one case that Sehorn cites says just the opposite: that while "there may be some situations in which tolling the speedy trial clock due to a codefendant's actions may violate another defendant's Sixth Amendment right ... this does not render the Speedy Trial Act unconstitutional as a matter of law." United States v. Baker, 63 F.3d 1478, 1497 (9th Cir.1995), cert. denied, 516 U.S. 1097, 116 S.Ct. 824, 133 L.Ed.2d 767 (1996).
 
 
 73
 Furthermore, as Baker makes clear, a Sixth Amendment speedy trial claim is assessed by considering a combination of factors, including: (1) the length of the delay; (2) the reason for the delay; (3) whether the defendant asserted his right to a speedy trial; and (4) the prejudice to the defendant. Id. (citation omitted). As in Baker, Sehorn does not demonstrate that he was prejudiced by the delay. Thus, the district court properly interpreted the Speedy Trial Act and did not abuse its discretion in finding that the case was complex.
 
 
 74
 XII. Was the district court's Allen instruction coercive?
 
 
 75
 Appellant Sehorn argues that the district court's modified Allen instruction was coercive. The district court gave this instruction after the jury advised the court that it was unable to reach a consensus with regard to the charges against Sehorn arising from the July 11 robbery. The district court instructed the jury that it should attempt to reach a unanimous verdict "if each of you can do so without violating your individual judgment and conscience." The court then instructed the foreman to continue deliberations "if any juror feels that further deliberations might lead to a verdict." The jury returned guilty verdicts as to Sehorn the next day.
 
 
 76
 The trial court's decision to instruct the jury with an Allen instruction is reviewed for an abuse of discretion. United States v. Hernandez, 105 F.3d 1330, 1333 (9th Cir.), cert. denied, --- U.S. ----, 118 S.Ct. 227, 139 L.Ed.2d 160 (1997) (citation omitted). The trial court's deliverance of an Allen instruction "must be upheld unless it is clear from the record that the charge had an impermissibly coercive effect on the jury." Id. (quoting United States v. Lorenzo, 43 F.3d 1303, 1307 (9th Cir.1995)).
 
 
 77
 Four factors are considered in assessing the potential coercive effect of an Allen instruction: (1) the form of the instruction given; (2) the period of jury deliberation following the instruction; (3) the total time of deliberation; and (4) any indicia of coerciveness or pressure upon the jury. See United States v. Wauneka, 842 F.2d 1083, 1088 (9th Cir.1988).
 
 
 78
 Sehorn argues that the one-day period of jury deliberation following the instruction demonstrates coercion. But Sehorn does not offer any reason why this is so. He merely cites a case from this circuit for the proposition that three and one-half hours of deliberation was insufficient to show coercion. See United States v. Beattie, 613 F.2d 762, 765 (9th Cir.1980). However, that same case noted that "while the time elapsed between the verdict and the charge is significant, it is not dispositive." Id. Sehorn offers no reason why a one-day deliberation was coercive, and no reason is apparent from the record.
 
 
 79
 Sehorn also argues that one of the jurors overheard a marshal say something disparaging about the length of time the jury was spending deliberating. However, the juror did not know if the marshal was even referring to this particular jury. Additionally, all jurors stated that the marshal's comment did not affect their deliberations or influence their verdict in any way. Thus, there is no evidence that the comment was in any way coercive.
 
 
 80
 Other indicia of coercion were also not present. The district court did not mention the possible expense of a retrial. See United States v. Mason, 658 F.2d 1263, 1267 (9th Cir.1981). There was no indication that the district court knew the numerical division of the jury, or even which way the jury was leaning. See United States v. Easter, 66 F.3d at 1023. There is no evidence to suggest that the district court gave the Allen instruction in an atmosphere of frustration over the deadlock. See United States v. Bonam, 772 F.2d 1449, 1451 (9th Cir.1985).
 
 
 81
 Thus, the record shows no evidence of coercion regarding the Allen instruction. The district court did not abuse its discretion.
 
 
 82
 XIII. Were Edwards' statements involuntary?
 
 
 83
 Appellant Edwards claims that certain statements she made during questioning by the police were involuntary and that the district court erred in failing to grant her motion to suppress these statements. These statements included confessions to a robbery in Monrovia, implications of Nelson in the robbery and fencing of stolen jewelry, and discussions about several other robberies and the relationship between the co-conspirators.
 
 
 84
 Edwards contends that threats were made to her concerning her ability to see her young daughter again and against her brother, a Los Angeles Police Officer. She also maintains that promises of leniency were made to her during the interrogation, and that she was under the influence of medication when she made her statements. She contends that the threats and promises were made during the periods when the tape recorder in the interrogation room was turned off. The district court denied her motion to suppress and found that her version of the interrogation was not credible.
 
 
 85
 This court reviews the denial of a suppression motion de novo. United States v. Moreno-Flores, 33 F.3d 1164, 1168 (9th Cir.1994). This court also reviews de novo the voluntariness of a confession, looking at the totality of the circumstances. United States v. Andaverde, 64 F.3d 1305, 1310 (9th Cir.1995), cert. denied, 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996). The district court's factual findings underlying its determination of voluntariness are reviewed for clear error. United States v. Manning, 56 F.3d 1188, 1196 (9th Cir.1995). This court gives special deference to the district court's credibility determinations. United States v. Ramos, 923 F.2d 1346, 1356 (9th Cir.1991).
 
 
 86
 Edwards presents little evidence-other than her own allegations-to suggest that her statements were involuntary. The district court expressly found that Edwards' allegations were not credible. The district court found no evidence that she was under the influence of any medication, let alone so incapacitated that her free will was overcome. Cf. Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir.1989) (holding that defendant's intoxication during questioning was not enough to overcome his free will and render his confession involuntary). The district court also found no evidence of threats regarding Edwards' baby or her brother. Nor did the district court find any evidence that the police officers made any promises of leniency or threats of penalties for the crime. Edwards does not deny that she received her Miranda warnings both orally and in writing.
 
 
 87
 The district court's factual findings were not clearly erroneous. The totality of the circumstances does not show that Edwards' statements were coerced.
 
 
 88
 XIV. Was Sehorn properly sentenced?
 
 
 89
 The district court sentenced Sehorn to a 20-year mandatory sentence on Count Two, which charged aiding and abetting a firearms crime under 18 U.S.C. § 924(c). This statute provides that "[i]n the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years ..." Because Sehorn was previously convicted under this statute for a Los Angeles robbery, the district court sentenced Sehorn to the mandatory twenty-year sentence.
 
 
 90
 Sehorn argues that the mandatory twenty-year sentence was not warranted because the Los Angeles robbery occurred after the July 1992 robbery for which appellant was convicted in this case. However, the language of § 924(c) plainly refers to a subsequent conviction, not a subsequent crime. As this court has pointed out: "There is nothing in the simple wording of this statute that requires that an offense underlying a second conviction occur after the conviction for the first offense. The only requirement is that a conviction be second or subsequent, not that any offense underlying that conviction follow a first conviction." United States v. Neal, 976 F.2d 601, 602 (9th Cir.1992). See also Deal v. United States, 508 U.S. 129, 134, 113 S.Ct. 1993, 1997-98, 124 L.Ed.2d 44 (1993) (noting that the term "second or subsequent conviction" means that "a defendant convicted of a crime committed in 1992, who has previously been convicted of a crime committed in 1993, would receive the enhanced sentence"). Thus, the twenty-year mandatory sentence was proper.[12]
 
 
 91
 XV. Was Nelson properly sentenced?
 
 
 92
 Nelson argues that the district court did not deduct from his sentence the 45 months he had spent in prison during the trial. He bases this argument on Application Note 3 to § 5G1.3, which states:
 
 
 93
 When a sentence is imposed pursuant to subsection (b), the court should adjust for any term of imprisonment already served as a result of the conduct taken into account in determining the instant sentence (e.g. if the appropriate total punishment determined under this subsection for all offenses is 30 months and the defendant has already served 10 months of the prior undischarged term of imprisonment, the court should impose a sentence of 20 months concurrent with the undischarged term).
 
 
 94
 The district court calculated Nelson's sentencing range under U.S.S.G. 5G1.3(b) (1991 version) to be 168-210 months. The district court imposed a sentence of 150 months. While the district court said that Nelson was not getting credit for the months spent on the case, the court did note that adding 45 months to the 150 month sentence would bring the total sentence to the middle of the 168-210 range. The application note merely commands the district court to "adjust" for time served; if the district court does make such an adjustment, it is irrelevant how the court chooses to characterize its action. Thus, we hold that the district court did properly adjust for the time Nelson spent in custody during trial.[13]
 
 
 95
 Thus, Nelson was properly sentenced.
 
 
 96
 XVI. Was Edwards properly sentenced?
 
 
 97
 Appellant Edwards argues that the district court erred in not granting her request for a minor participant sentence reduction. She also argues that the district court erred in imposing a sentence enhancement for physical restraint of a victim.
 
 
 98
 Section 3B1.2(b) of the Sentencing Guidelines provides for a decrease of two offense levels if the defendant was a minor participant in the criminal activity. The district court found that Edwards neither played a minor role nor a leadership role in the July 11 robbery. The district court found that Edwards participated in the robbery, was present in the jewelry store, helped put the jewelry in the pillowcase, and was present during the planning of the robbery. Based on these findings, we hold that Edwards' culpability is at best equivalent to that of the other robbers inside the store. See United States v. Sanchez-Lopez, 879 F.2d at 557 (holding that the district court was not clearly erroneous in determining that appellant was not a minor participant where his participation "was equal to that of the other [co-defendants]").
 
 
 99
 Section 2B3.1(b)(4)(B) of the Sentencing Guidelines provides for a sentence enhancement "if any person was physically restrained to facilitate commission of the offense." The commentary to § 2B3.1(b)(4)(B) states that: "The guideline provides an enhancement for robberies where a victim was forced to accompany the defendant to another location, or was physically restrained by being tied, bound, or locked up." Edwards argues that this commentary provides the only examples of physical restraint.
 
 
 100
 This court rejected just such an argument in United States v. Thompson, 109 F.3d 639, 641 (9th Cir.1997) (noting that the commentary's examples are "merely illustrative"). In Thompson, this court held that "[w]hen a dangerous weapon is used to force a person to move about, that person has been physically restrained just as surely as if he was grabbed by the collar and pulled along." Id. (also holding that physical contact with the victim is unnecessary). In this case, it is uncontroverted that Lott ordered a jewelry store employee and customer to the back room at gunpoint. This constitutes physical restraint. Thus, the district court's sentence enhancement is not clearly erroneous.
 
 
 101
 Edwards also claims that the upward adjustment for physical restraint amounts to "double-counting" because she also received a sentence for a firearms violation under 18 U.S.C. § 924(c). In United States v. Duran, 4 F.3d 800, 804 (9th Cir.1993), this court held that a sentence enhancement for an express threat of death was inappropriate when the defendant was also convicted of a firearms violation under § 924(c). The court based its holding on the fact that the Sentencing Guidelines: (1) viewed an express threat of death as the equivalent of possession, use, or discharge of a firearm during a robbery, and (2) prohibited such an equivalent from being used to enhance a sentence. Id. However, the physical restraint of the victims is not the equivalent of the possession, use, or discharge of a firearm. Thus, the district court did not err in adjusting Edwards' sentence for physical restraint.
 
 CONCLUSION
 
 102
 The district court's judgment is AFFIRMED in part and REVERSED as to Edwards' conviction of aiding and abetting the firearms crime during the August 12 robbery. We REMAND to the district court for resentencing of Edwards in light of this reversal.
 
 
 
 [1]
 While appellants are African-American, not Hispanic, the Supreme Court has held that "there is no rule that [Sixth Amendment claims] may be made only by those defendants who are members of the group excluded from jury service." Taylor v. Louisiana, 419 U.S. 522, 526, 95 S.Ct. 692, 695, 42 L.Ed.2d 690 (1975)
 
 
 [2]
 Appellants also argue that the district court erred in denying Criminal Justice Act funds for an expert witness on prejudice against Hispanics and underrepresentation of the poor in the jury wheel. This court has recently held that a district court's denial of a request for public funds to hire an expert under 18 U.S.C. § 3006A(e)(1) of the Criminal Justice Act is reviewed for an abuse of discretion. See United States v. Labansat, 94 F.3d 527, 530 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 1013, 136 L.Ed.2d 890 (1997). Under this standard, appellants "must demonstrate both that reasonably competent counsel would have required the assistance of the requested expert for a paying client, and that he was prejudiced by the lack of expert assistance." Id. (citation omitted). Furthermore, "[p]rejudice must be shown by clear and convincing evidence." Id. (citation omitted). Appellants cannot demonstrate that a reasonably competent counsel would have requested funds for these studies because a study of the prejudice against Hispanics and the poor is not relevant to overcoming the lack of a prima facie showing of underrepresentation
 
 
 [3]
 Lott argues that this court's decision in United States v. Sherwood, 98 F.3d 402 (9th Cir.1996), required a substantial effect on interstate commerce rather than merely a de minimis effect. In Sherwood, however, this court merely noted that Lopez required the higher "substantial effect" standard where Congress sought to regulate a purely intrastate noncommercial activity. Id. at 411. Without expressly deciding whether the "substantial effect" standard applied to Hobbs Act violations, the Sherwood court held that, assuming the "substantial effect" standard did apply, the government had met its burden. Id. In contrast, Atcheson expressly decided that "the Hobbs Act is concerned solely with inter state, rather than intra state, activities" such that "Lopez 's 'substantially affects' test is not applicable." 94 F.3d at 1242 (emphasis in original). Moreover, the holding of Atcheson was recently reaffirmed by this court in United States v. Woodruff, 122 F.3d 1185, 1186 (9th Cir.1997) (reaffirming that, even after Lopez, the government need only show a de minimis effect on interstate commerce to satisfy the Hobbs Act's jurisdictional requirement)
 
 
 [4]
 Appellant Sehorn also argues individually that there was insufficient evidence to convict him under the Hobbs Act. Sehorn admits, however, that government witnesses testified that he helped plan the robbery. Furthermore, the witnesses' testimony was corroborated by independent evidence such as Western Union records, cellular phone records, hotel records, and other evidence. Construing this evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the crime beyond a reasonable doubt
 
 
 [5]
 Appellants also claim that the district court erroneously excluded the testimony of an expert witness, Thomas Wotruba, on the effect of the robberies on interstate commerce. Wotruba would have testified that the loss from the robberies represented a small percentage of retail jewelry store sales in San Diego, California, and the United States. Even if this data were relevant to the effect on interstate commerce, it would not have assisted the jury because a de minimis effect is all that is required
 
 
 [6]
 Appellants also argue that the district court erred in not instructing the jury that "use" of a firearm for purposes of § 924(c) is limited to "active employment" after the Supreme Court's ruling in Bailey, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472. This argument is without merit. The district court, in its instruction as to the substantive offense under § 924(c), specifically adhered to the "active employment" test
 
 
 [7]
 One juror said he "partially" heard an answer to the question, but did not elaborate. He also stated that he could disregard whatever he had heard
 
 
 [8]
 Lott suggests that the prosecutor's numerous leading questions and improper vouching for the witness deprived appellants of a fair trial. Regarding leading questions, the trial courts have broad discretion under Rule 611(c) and reversal is proper only if "the judge's action ... amounted to, or contributed to, the denial of a fair trial." United States v. Castro-Romero, 964 F.2d 942, 943 (9th Cir.1992) (citation omitted). The record does not reflect that the judge's actions denied appellants a fair trial, especially given the fact that the district court sustained many objections to leading questions and repeatedly admonished the prosecutor to ask more appropriate questions. Moreover, the question asked to Overstreet simply did not constitute improper vouching. See United States v. Jackson, 84 F.3d 1154, 1158 (9th Cir.1996), cert. denied, --- U.S. ----, 117 S.Ct. 445, 136 L.Ed.2d 341 (1996) (noting that improper vouching occurs when the prosecutor places "the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggests that information not presented to the jury supports the witness's testimony") (citation and internal quotations omitted)
 
 
 [9]
 Nelson also argues that the government failed to provide reasonable notice of the nature of the 404(b) evidence--specifically its legal purpose--in its notice or motion in limine. However, the record shows that the government's notice states that the evidence would be used to show "planning, preparation, and intent." The government's legal memorandum regarding the 404(b) evidence also outlines in detail the purpose of the evidence
 
 
 [10]
 Nelson's reliance on Rutledge v. United States, 517 U.S. 292, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996), is misplaced. In that case, the Supreme Court merely found that conspiracy to distribute controlled substances under 21 U.S.C. § 846 is a lesser included offense of conducting a continuing criminal enterprise under 21 U.S.C. § 848 for double jeopardy purposes. That case did not deal with aiding and abetting and conspiracy
 
 
 [11]
 Sehorn also argues that a witness, Darry Herrington, who testified only about the August 12 robbery, identified him in the courtroom and thus prejudiced him. However, the identification was merely in response to the question "Do you recognize people in the courtroom?" The question was not directed at who was involved in the robbery. Furthermore, Herrington later did identify who went in to rob the jewelry store, and did not identify Sehorn then
 
 
 [12]
 Sehorn also suggests that the twenty-year sentence under § 924(c) should have been concurrent, not consecutive. The plain language of § 924(c)(1), however, clearly states that the term of imprisonment imposed under the statute shall not run concurrently with any other term of imprisonment. Sehorn also claims error in the computation of his sentence, claiming that § 5G1.3(b) of the Sentencing Guidelines applies to his case. However, the district court plainly did apply § 5G1.3(b), and it did so properly
 
 
 [13]
 Nelson also argues that a phone call to the Bureau of Prisons suggests that he will only be released after serving approximately 427 months in custody. This allegation is unsupported by the record before this court and has apparently not been brought before any administrative body. See United States v. Berry, 814 F.2d 1406, 1410 (9th Cir.1987) (holding that an inmate must exhaust his administrative remedies before litigating the Bureau of Prisons' calculation of credit)